UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH BRIGGS,

                Plaintiff,

     -v-

ANDREW SAUL, Commissioner of Social Security,

                Defendant.

CIVIL ACTION NO.: 19 Civ. 9776 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge:

## I.    INTRODUCTION

Plaintiff Joseph Briggs ("Mr. Briggs") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  He seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Act.  Mr. Briggs contends that the decision of the Administrative Law Judge dated October 29, 2018  (the "ALJ Decision") was erroneous, not supported by substantial evidence, and contrary to law, and asks the Court to (a) reverse the Commissioner's decision for the calculation and award of benefits, or (b) remand for a new hearing to reconsider the evidence.

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On April 29, 2020, Mr. Briggs filed a motion for judgment on the pleadings (ECF No. 12) ("Mr. Briggs's Motion"), and on July 20, 2020 the Commissioner cross-moved (ECF

No. 17) (the "Commissioner's Motion").  For the reasons set forth below, Mr. Briggs's Motion

(ECF No. 12) is GRANTED and the Commissioner's Motion (ECF No. 17) is DENIED.

## II.    BACKGROUND

### A.  Procedural History

On April 9, 2016, Mr. Briggs filed an application for DIB[1] and SSI benefits,[2] alleging that he

had been unable to work since December 31, 2011.  (SSA Administrative Record ("R.") 178–207

(ECF No. 9)).  On June 21, 2016, the SSA denied Mr. Briggs's application, finding that he was not

disabled.  (R. 87–106).  On October 11, 2016, Mr. Briggs filed a written request for a hearing

before an ALJ.  (R. 116).  On September 26, 2018, he appeared before ALJ Kieran McCormack for

an evidentiary hearing, and amended his alleged onset date to April 1, 2016.  (R. 56–86).

On October 29, 2018, ALJ McCormack issued a decision finding that Mr. Briggs was not

disabled under the Act.  (R. 1–19).  Although he found that Mr. Briggs had five severe impairments

— lumbar disc bulging, medial meniscus tear of left knee, chondromalacia[3] of the right knee,

osteochondral defect[4] of right ankle, and obesity — the ALJ concluded that the severity of Mr.

---

[1] In order to quality for DIB, one must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.  Mr. Briggs met the insurance requirements through September 30, 2018, and thus his disability must have begun on or before that date to quality for DIB.  (R. 6).

[2] SSI, unlike DIB, has no requirement of being insured for benefits, but requires a showing of financial need.  20 C.F.R. § 416.202. The definition of disability is the same for both DIB and SSI, but the onset date for SSI is the date the claimant filed an application for benefits, and the benefits are limited to that date forward.

[3] Chondromalacia is the softening and breakdown of the tissue (cartilage) on the underside of the patella.  Pain results when the knee and the femur rub together.  Dull, aching pain and/or a feeling of grinding when the knee is flexed may occur.   See  Knee Pain (Chondromalacia Patella),  Cleveland Clinic (Oct. 6, 2014), https://my.clevelandclinic.org/health/diseases/15607-knee-pain-chondromalacia-patella.

[4] An osteochondral defect refers to a focal area of damage that involves both the cartilage and a piece of underlying bone.  These can occur from an acute traumatic injury to the knee or an underlying disorder of the bone.  See Chodral/Osteochondral Defect, Stanford Health Care, https://stanfordhealthcare.org/medical-conditions/bones-joints-and-muscles/chondral-osteochondral-defect.html (last visited Feb. 24, 2021).

Briggs's impairments did not meet or medically equal the requisite criteria for a finding of disability. (R. 8).

On September 4, 2019, the SSA Appeals Council denied Mr. Briggs's request for review of ALJ McCormack's decision. (R. 20–27). On October 23, 2019, Mr. Briggs filed the Complaint in this Court. (ECF No. 1). Mr. Briggs argues that ALJ McCormack failed to appropriately apply the treating physician rule, improperly weighed the medical evidence, and failed to properly evaluate his subjective allegations. (ECF No. 13).

Mr. Briggs raises two points in his Motion: (1) that the ALJ failed to properly weigh the medical opinion evidence in determining Mr. Briggs's RCF; and (2), that the ALJ failed to properly evaluate Mr. Briggs's subjective allegations. (ECF No. 13). The Commissioner argues that the decision is supported by substantial evidence. (ECF No. 18).

B. **Factual Background**

1. **Non-medical evidence**

Mr. Briggs was born in 1974 and was 41 years old on April 1, 2016, his alleged disability onset date. (R. 13). He has a high school education and engaged in past relevant work as a children's institution attendant. (R. 13). Mr. Briggs lives with his mother, whom he testified helps him "a lot" and cooks for him. (R. 79). He tries to do "little things" around the house, but testified that he does not help often because he cannot lift much weight. (R. 81).

Mr. Briggs testified that he usually starts his day with physical therapy stretches, because his pain is worse in the morning; afterwards, he showers and gets ready by himself. (R. 79). Then, Mr. Briggs said that he likes to read or go fishing, which he cannot do "for too long" and then goes home to watch television or read. (R. 79). During these activities, Mr. Briggs must change

positions, place a pillow between his knees, or do physical therapy stretches. (R. 79). Sometimes, his sister will take him for a drive or dinner to get out of the house, but they have "to keep stopping" for him along the way. (R. 79–80). Mr. Briggs does not drive himself or use public transportation, but uses medical transportation as necessary. (R. 80).

      2.   **Medical evidence**

      a.      **Dr. Julia Kaci, SSA consultative internal medicine examiner**

On June 9, 2016, Dr. Julia Kaci conducted a consultative internal medicine examination in connection with Mr. Briggs's SSA application. (R. 368). His chief complaint at the time of this appointment was back pain subsequent to a 2002 car accident[5] and left knee pain despite a recent surgery to stabilize the patella. (R. 368). Mr. Briggs rated his back pain as an 8–9 on a scale of 10, and explained that the pain was worse when bending, sitting, and standing for more than 30 minutes. (R. 368). He told Dr. Kaci that he cooks once a week, does not do any cleaning because he cannot bend down, does laundry and shopping once a week, and is able to take care of his personal hygiene. (R. 369). Mr. Briggs also stated that he liked to watch television, read, and go out to dinner. (R. 369).

Dr. Kaci's physical examination revealed that Mr. Briggs was not in acute distress, but had a "very guarded" gait and could not walk on his heels and toes without difficulty. (R. 369). Dr. Kaci also noted that when Mr. Briggs walked, his left patella shifted laterally and that he was only able to squat one-third of the way down. (R. 369).

---

[5] In 2002, Mr. Briggs injured his back and neck in a car accident. After the accident, Mr. Briggs underwent a spinal fusion at White Plains Hospital. (R. 368). Records related to this injury and surgery are not part of the record as they are outside of the time period considered for Mr. Briggs's claims.

Dr. Kaci's musculoskeletal exam of Mr. Briggs's cervical spine showed full flexion and extension, lateral extension bilaterally, and full rotary movement bilaterally.  (R. 370).  The lumbar spine exam showed flexion of 60 degrees, extension of 25 degrees, full lateral flexion bilaterally and full rotary movement bilaterally.  (R. 370).  The straight leg raise was positive at 45 degrees in supine position bilaterally, and negative in a sitting position; Mr. Briggs had full range of motion in his shoulders, elbows, forearms and wrists, hips, knees and ankles bilaterally. (R. 370).  Dr. Kaci noted that Mr. Briggs's left knee was is full but painful, and that the knee was enlarged and very unstable on palpation.  (R. 370).

Dr. Kaci diagnosed Mr. Briggs with chronic lower back pain, chronic neck pain, and left knee instability, with a "stable" prognosis.  (R. 371).  Based on Mr. Briggs's medical history and her exam, Dr. Kaci concluded in her medical source statement that Mr. Briggs had "moderate limitations to standing, sitting, walking, bending, lifting, carrying, pushing and pulling, and marked limitations to kneeling and squatting and going up and down the stairs."  (R. 371).

### b.    Dr. Richard Weinstein

Dr. Richard Weinstein, an orthopedist, treated Mr. Briggs for his lower back and joint pain at White Plains Hospital from at least December 2014 through the date of the ALJ Decision. (R. 423, 542).

On December 9, 2016 Mr. Briggs saw Dr. Weinstein for continued lower back pain that was not relieved with home exercises or medication.  (R. 424).  The pain was disrupting his sleep and causing him radiating pain, numbness and tingling.  (R. 424).  Dr. Weinstein's physical exam revealed moderate tenderness of the left sciatic notch and moderate limitation to range of motion with discomfort of the lumbar spine.  (R. 424).  Dr. Weinstein's impression was that Mr.

Briggs suffered from lower back pain with left radiculopathy.  (R. 424).  He noted that Mr. Briggs needed left knee surgery and prescribed physical therapy for Mr. Briggs's back pain.  (R. 424).

On January 6, 2017 Mr. Briggs returned to Dr. Weinstein and report continued pain in his lower back and left knee.  (R. 415).  The physical examination revealed Mr. Briggs's limited range of motion in his lumbar spine (flexion: 60 degrees (normal is 90 degrees); extension: 20 degrees (normal is 30 degrees); bilateral rotation: 20 degrees (normal is 30 degrees)).  (R. 415).  Mr. Briggs had both paraspinal tenderness and spasm on palpation, especially at the extremes.  (R. 415).  The left knee exam revealed a slightly decreased range of motion with significant subluxation of the patella and slight weakness of quadricep muscles.  (R. 416).  Dr Weinstein's impression and plan remained unchanged from the December 2017 appointment.  (R. 416).

On February 13, 2017, Mr. Briggs saw Dr. Weinstein for worsening pain and swelling in his left knee and lower back pain, and stated that he was beginning to experience pain in his right knee and right ankle.  (R. 417).  Dr. Weinstein concluded that Mr. Briggs required left knee surgery and prescribed physical therapy for Mr. Briggs's lower back pain.  (R. 418).

On September 5, 2017, Mr. Briggs saw Dr. Weinstein for lower back pain and worsening right ankle pain, especially when walking or twisting.  (R. 429).  Dr. Weinstein's ankle exam revealed no swelling or instability, but limited range of motion (dorsiflexion: 10 degrees (normal is 20 degrees); plantar flexion: 20 degrees (normal is 50 degrees), abduction: 10 degrees (normal is 20 degrees), adduction: 5 degrees (normal is 10 degrees)).  (R. 430).  Mr. Briggs was also "markedly tender on the lateral collateral ligament."  (R. 430).  Dr. Weinstein diagnosed a right lateral ankle sprain and ordered an MRI of the right ankle.  (R. 430).

The September 12, 2017 MRI Report of Mr. Briggs's right ankle revealed a partial tear of the anterior talofibular ligament, partial tear of third ligament, and defects and a cyst on the medial aspect of the dome of the talus. (R. 428). On September 19, 2017, Dr. Weinstein saw Mr. Briggs for continued right ankle pain and to discuss the MRI. (R. 502). The physical exam of the right ankle showed no swelling, but some tenderness of lateral gutter; Mr. Briggs had approximately full range of motion in the right ankle, with slight discomfort at the extreme. (R. 502). Dr. Weinstein explained that the MRI showed a partial tear of the ATF ligament, a large osteochondritis dissecans of the medial aspect of the talar dome and medial malleolus. (R. 503). Dr. Weinstein directed Mr. Briggs to try physical therapy to increase the right ankle range of motion and to build strength. (R. 503). Mr. Briggs was told to avoid high impact on the right ankle, and to come back in six weeks for a reevaluation. (R. 503). Dr. Weinstein noted that if the issues persisted, they would need to consider surgical intervention. (R. 503).

On December 4, 2017, Dr. Weinstein saw Mr. Briggs to assess continued lower back and right ankle pain. (R. 484). Dr. Weinstein noted that Mr. Briggs had not been to physical therapy because he ran out of insurance-covered appointments. (R. 484). The lower back exam revealed mild tenderness and spasms of paraspinal muscles, with limited range of motion and discomfort at the extremes. (R. 484). The right ankle exam showed no swelling, mild tenderness of lateral gutter, and approximately full range of motion with slight discomfort at extremes. (R. 485). Dr. Weinstein also reviewed x-rays of the lumbar spine, which showed a slight loss of normal curvature. (R. 485). Dr. Weinstein's impression was that Mr. Briggs had a right lateral ankle

sprain with OCD lesion[6] and continued pain and chronic lower back pain with mild right radiculopathy. (R. 485). Dr. Weinstein directed Mr. Brigs to continue his home exercise program, to avoid high-impact activity, and to follow up for possible steroid injection in lower back. (R. 485).

On December 20, 2017, Mr. Briggs saw Dr. Rahman, a colleague of Dr. Weinstein's at White Plains Hospital, for an initial evaluation of his lower back pain. (R. 468). Dr. Rahman's evaluation revealed tenderness in Mr. Briggs's lumbar, sacroiliac, and thoracic spines; his tested ranges of motion were all abnormal, but with normal muscle strength. (R. 468). Dr. Rahman noted that Mr. Briggs had lower facet tenderness on extension and rotation, that his bending, rotation and extension were limited due to increased discomfort and that he had tender points along the thoracolumbar and lumbosacral paraspinal areas. (R. 469). On January 8, 2018, Dr. Rahman gave Mr. Briggs a caudal epidural steroid injection for the lower back pain. (R. 466).

On January 15, 2018, Mr. Briggs saw Dr. Weinstein and reported pain in his right knee. (R. 489). The physical examination demonstrated limited range or motion in the right knee (flexion: 125 degrees (normal is 135 degrees); 0 degrees extension (normal is 0)), marked tenderness in the medial joint line and lateral joint line as well as fat pad tenderness, but with no instability and normal patella tracking. (R. 489). Dr. Weinstein ordered an MRI to rule out a

---

[6] An osteochondral lesion of the talus (OLT) is an area of abnormal, damaged cartilage and bone on the top of the talus bone (the lower bone of the ankle joint). This condition is also known as osteochondritis dissecans (OCD) of the talus or a talar osteochondral lesion (OCL). See Osteochondral Lesion of the Talus (OLT), Massachusetts General Hospital, https://www.massgeneral.org/orthopaedics/foot-ankle/conditions-and-treatments/ocd-osteochondral-defect (last visited Feb. 24, 2021).

meniscus tear, and noted that they would consider an injection, but if the MRI showed a tear Mr. Briggs might need surgery.  (R. 490).

On February 7, 2018, Mr. Briggs saw Dr. Weinstein for his lower back, right knee, and right foot pain.  (R. 454).  He told Dr. Weinstein that his lower back pain was a little better with injections he received from Dr. Rahman.  (R. 454).  Dr. Weinstein's exam of the right knee showed patellofemoral crepitus, slight tenderness medially but minimum tenderness laterally and no instability.  (R. 454).  Mr. Briggs had limited range of motion (flexion to 120 degrees) and had pain on full flexion.  (R. 454).  Dr. Weinstein noted that Mr. Briggs still needed to obtain an MRI of the right knee.  (R. 455).

Mr. Briggs's February 14, 2017 MRI on his right knee revealed moderate joint effusion and small multiloculate cystic structure extending to the posterior aspect of Hoffa's fat pad, abnormal thinning of cartilage consistent with osteoarthritic change; prominent trochlea of lateral femoral condyle and mild lateral subluxation of patella, fissure on cartilage consistent with bone marrow edema, and signs of friction syndrome from abnormal patellar tracking.  (R. 461–62).

On April 24, 2018, Mr. Briggs saw Dr. Weinstein for his right ankle and right knee pain. (R. 531).  Mr. Briggs stated that he had some improvement in his pain with physical therapy and home exercises.   (R.531).   The physical examination of the right knee revealed joint line tenderness limited range of motion (120 degrees flexion) and mild crepitus (grating sound on joint movement).  (R. 531).  Dr. Weinstein explained that the MRI showed no meniscus tear, but did reveal mild joint effusion, thinning of condyle, and soft tissue edema consistent with friction syndrome.  (R. 532).  Dr. Weinstein's physical examination of the right ankle revealed tenderness laterally but not medially and approximately full range of motion with discomfort at extremes.

(R. 532).  Dr. Weinstein's impression was that Mr. Briggs had continued right knee pain with mild arthritic changes and inflammation of the medial fat pad and chronic right lateral ankle sprain with history of OCD lesion and continued symptoms.  (R. 532).  His plan was a cortisone injection for the right knee and continued home exercises and physical therapy.  (R.532).

On April 24, 2018, Mr. Briggs also saw Dr. Rahman for a follow up appointment after receiving a facet block for his lower back pain.  (R. 525).  Mr. Briggs explained that the block had helped significantly, but that the pain had returned.  (R. 525).  Dr. Rahman noted that a second block was planned, after which he would ask Mr. Briggs to consider therapeutic radiofrequency ablations.  (R. 525).  Dr. Rahman's physical examination revealed tenderness of the lumbar, sacroiliac and thoracic spines, and all abnormal ranges of motion, with normal muscle strength. (R. 525).  Dr. Rahman noted that Mr. Briggs's bending, rotation and extension were limited due to increased discomfort.  (R. 526).

On June 27, 2018, Mr. Briggs saw Dr. Weinstein to follow up for his right foot and right ankle pain, which he felt when walking.  (R. 542).  Dr. Weinstein's physical exam of the right ankle revealed no significant welling, tenderness laterally but not medially, and slightly decreased range of motion.  (R. 544).  Dr. Weinstein's impression was that Mr. Briggs had worsening right ankle pain with OCD and directed Mr. Briggs to follow up in four weeks to consider an injection for the right ankle.  (R. 544–45).

### c.   Dr. Lauren Redler

### i.   Office visits pre-surgery

Dr. Lauren Redler, an orthopedic surgeon at Columbia Doctors, conducted Mr. Briggs's left knee reconstruction surgery and treated Mr. Briggs before and after the operation.  On

February 13, 2017, Mr. Briggs saw Dr. Lauren Redler for a second opinion as to whether his left knee needed additional surgery.  (R. 440).  At this appointment, Dr. Redler noted that Mr. Briggs's left patella dislocated at full extension and was tender to palpation.  (R. 438).  Diagnostic imaging reveled significant lateral patellar translation.  (R. 438).  Her impression was that Mr. Briggs had chronic patellar instability with x-ray findings concerning for advanced patellofemoral osteoarthritis.  (R. 439).  Dr. Redler planned to schedule an MRI to evaluate chondral surfaces of Mr. Briggs's left patella, and noted that he would "clearly will need surgical revision."  (R. 439).

On March 1, 2017, Dr. Redler saw Mr. Briggs on review of his MRI.  (R. 436).  She diagnosed Mr. Briggs with left patellar instability with patellofemoral osteoarthritis in the medial meniscus and discussed the treatment options with Mr. Briggs, including various surgical options, which Dr. Redler planned to discuss with colleagues.  (R. 437).

### ii.   Impairment questionnaire

On April 6, 2017, ahead of the April 19, 2017 reconstructive surgery, Dr. Redler completed an impairment questionnaire for Mr. Briggs's use in connection with his benefits applications.  (R. 410–14).

Dr. Redler had seen Mr. Briggs twice before completing the questionnaire, on February 13, 2017 and March 2, 2017.  (R. 410).  She noted her diagnosis as left knee recurrent patellar instability; degenerative joint disease, and a left knee medial meniscus tear.  (R. 410).  As laboratory support for her diagnosis, Dr. Redler cited Mr. Briggs's positive patellar apprehension test, increased lateral patellar tilt and translation, positive Apley's grind (meniscus), positive patellar grind, positive medial McMurray's test, MRI confirmed medial meniscus tear, subluxed

11

patella and full thickness chondral wear of the patella and trochlea.  (R. 410).  She opined that she expected the condition to last at least twelve months.  (R. 410).

She described the nature of Mr. Briggs's pain as constant, sharp, with acute flare ups in the left knee, and aggravated by twisting, stairs, prolonged sitting, pivoting, and kneeling. (R. 411).  She noted that left knee reconstruction surgery was scheduled for April 19, 2017. (R. 411).

As for work limitations, Dr. Redler opined that in an eight-hour workday, Mr. Briggs could sit with his knee extended and leg elevated for three to four hours and could stand or walk for less than an hour.  (R. 412).  She further stated that it was medically necessary for Mr. Briggs to avoid sitting for an eight-hour day, that he needed fifteen minutes before he could return to a seated position, and that he must elevate his leg to waist level while sitting for prolonged periods of time.  (R. 412).

As to exertional limitations, Dr. Redler found that Mr. Briggs could frequently lift and carry up to ten pounds, occasionally 10–20 pounds, but never more than 20, he could frequently grasp objects, and he could also use his hands, fingers and arms for reaching overhead.  (R. 412). Finally, Dr. Redler stated that Mr. Briggs would be absent more than three times a month. (R. 414).  Dr. Redler noted on the questionnaire that these opinions applied to Mr. Briggs's post-operation recovery period.  (R. 414).

### iii.    Surgery and post-surgery office visits

On April 9, 2017, Dr. Redler performed a left knee arthroscopy, partial medial meniscectomy, an arthrotomy with patellofemoral arthroplasty, and a revision MPFL/MQTFL reconstruction with quadriceps autograft.  (R. 443–53).

The record includes three post-operation follow up appointments, on May 8, 2017, June 15, 2017 and August 2, 2017.  (R. 432–35).  At the May 8, 2017 appointment, Dr. Redler noted that Mr. Briggs was doing well three weeks post-surgery and had started physical therapy at home.  (R. 435).  She found the left patella stable, but swollen as expected, and directed Mr. Briggs to start weight bearing as tolerated.  (R. 435).

On June 15, 2017, Mr. Briggs had no swelling, his left patella was still stable, and he demonstrated an increased range of motion.  (R. 434).  Dr. Redler noted that he should start advancing his physical therapy for strength building, and that she expected him to be able to go to the gym in next month, with normal lifting routine in four months.  (R. 434).

On August 2, 2017, the last post-surgery appointment, Mr. Briggs was "doing excellent." (R. 432).  Dr. Redler noted that she was going to try to get new physical therapy prescription to assist with Mr. Briggs's continued quad and hip weakness, but that he had no restrictions as to his left knee post-surgery.  (R. 432).

### d.    Dr. Nina Spooner, SSA consultative orthopedist

On May 21, 2018, nearly two years after Mr. Briggs was examined by SSA internal medicine consultant Dr. Kaci, Dr. Nina Spooner conducted a consultative orthopedic examination in connection with Mr. Briggs's application for SSA benefits.  (R. 507–17).

At this exam, Mr. Briggs stated that his chief complaints were pain in his lower back, left knee, and right foot.  (R. 507).  Dr. Spooner then reviewed Mr. Brigg's medical history, including his 2002 car accident and subsequent spinal fusion.  (R. 507).  She noted that post-operation, Mr. Briggs continued to experience increasing back pain, which was only mildly relieved by spinal injections and physical therapy.  (R. 507).

Mr. Briggs also explained to Dr. Spooner his history of pain in and injury to his left knee; he stated that since the second left knee surgery, he no longer had patella dislocations, but still had persistent pain and weakness and had difficulty with stairs.  (R. 507).  Mr. Briggs also explained that he had an MRI done on his right knee, which showed a sprain or contusion, and planned to get injections.  (R. 507).  The MRI on his right ankle showed a loss of cartilage and which was diagnosed as an osteochondral defect.  (R. 507).

Mr. Briggs told Dr. Spooner that the pain in his right foot and ankle was a 10 on a scale of 10, and rated his lower back and left knee pain on a level of 8–9 out of 10 for most of the day. (R. 507–08).  He stated that the pain disrupted his sleep and radiated down the back of his legs and caused stiffness.  (R. 508).  He also explained that he experienced intense right knee pain and occasional neck pain.  (R. 508).

Dr. Spooner then noted Mr. Briggs's alleged limitations based on his pain.  Mr. Briggs explained that because of his pain, he could not sit or stand longer than 20 minutes and could not walk further than half a block.  (R. 508).  He stated that he had difficulty cooking because he could not stand for prolonged times, and that he could not do house cleaning that required bending and could not do the walking or heavy lifting required to get groceries.  (R. 509).  He explained that when he does cook and clean, needs to take lots of breaks, although he could still shower and dress himself.  (R. 509).

Dr. Spooner reviewed Mr. Briggs's 2016 SSA evaluation and a spinal x-ray from June 2016 and next conducted her physical examination.  (R. 508).  Dr. Spooner noted that Mr. Briggs appeared to be in moderate distress with pain, and that his gait was slow and antalgic.  (R. 509).

Mr. Briggs declined toe and heel walking or squatting, and got on and off the examination table slowly. (R. 509).

The examination of Mr. Briggs's cervical spine showed full flexion and extension with no trigger points. (R. 509). The thoracic and lumbar spine exam revealed flexion to 40 degrees, extension to 10 degrees, lateral flexion to 20 degrees bilaterally and rotation 20 degrees bilaterally. (R. 510). There was no tenderness or spasms, and no trigger points. (R. 510). Examination of Mr. Briggs's lower extremities revealed that hip rotations that caused back pain, right knee flexion at 100 degrees and left knee flexion at 110 degrees. (R. 510). He had full range of motion in both ankles, no muscle atrophy, no joint effusion, and no instability. (R. 510).

Dr. Spooner diagnosed Mr. Briggs with chronic pain, low back, both knees and right foot, right knee pathology, osteochondral defect, status post back and knee surgeries, with a "fair" prognosis. (R. 510). Dr. Spooner opined in her medical source statement that Mr. Briggs had marked limitations for kneeling and squatting and moderate limitations for sitting, standing, walking, climbing stairs, bending, lifting and carrying. (R. 510).

As part of the same assessment, Dr. Spooner completed a "check box" questionnaire (the "Check Box Questionnaire") detailing the limitations caused my Mr. Briggs's impairments. (R. 512). In the Check Box Questionnaire, Dr. Spooner opined that Mr. Briggs could never carry or lift up to ten pounds; she supported this opinion with the statement, "claimant has chronic back and bilateral knee pain. He has chronic right foot and ankle pain. Lifting and carrying are going to increase claimant's pain." (R. 512). Dr. Spooner stated that Mr. Briggs could not sit for 20 minutes, stand for 20 minutes, or walk for 10 minutes at one time; he could sit a total of two hours in and eight-hour workday, stand for one hour and walk for one hour. (R. 513). Dr. Spooner

explained, "claimant is lying down for rest of 8 hours." (R. 513). Dr. Spooner supported this opinion by stating, "claimant has chronic back bilateral knee and right foot and ankle pain. This pain prevents him from doing any substantial sitting, standing or walking." (R. 513).

Dr. Spooner assessed that Mr. Briggs could occasionally reach and handle, but could never push or pull, because "claimant has chronic pain in his back, both his knees and in his right foot and ankle. He can't do sustained sitting or standing or tasks requiring sustained sitting or standing. Claimant also has history of lumbar spine surgery and should not be doing pushing or pulling, would cause back pain and overuse of his back." (R. 514). Mr. Briggs could never use foot controls because "claimant has a cartilage and bone defect in his right ankle causing chronic pain. He has chronic bilateral knee pain and moderate limitation of range of motion of both knees." (R. 514). Further, he could never: climb stairs or ramps, ladders or scaffolds, balance, stoop, kneel crouch or crawl because "claimant can't balance himself safely all the time due to chronic back, bilateral knee and right ankle and food pain, and also due to the limitation of range of motion of his back and knees. He can't support himself on his knees." (R. 515).

Dr. Spooner stated that Mr. Briggs could occasionally tolerate dust and fumes, never unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold or heat or vibrations because "claimant cannot do the sustained sitting required to operate a motor vehicle. He cannot operate food pedate adequate to operate a vehicle. exposure to humidity and extreme temperatures likely to worsen chronic pain." (R. 516).

As to activities of daily life, Dr. Spooner explained that Mr. Briggs could not shop, because he could not walk or lift, and could not travel alone. (R. 517). She stated that he could ambulate, but could not use public transportation because he could not do the sitting or standing required.

(R. 517).  She opined that he could not handle paper files because he could not handle the sitting or standing required.  (R. 517).  Finally, Dr. Spooner opined that these limitations were expected to or have lasted for at least twelve months, as necessary for a finding of disability under the Act. (R. 517).

    **C.  Administrative Proceedings**

        **1.  Hearings before ALJ McCormack**

On September 26, 2018, ALJ McCormack held an initial hearing, at which Mr. Briggs was represented by counsel.  (R. 56–91).  The ALJ started the hearing by explaining the importance of Mr. Briggs's testimony, the role of the vocational expert, and the general nature of the proceeding.  (R. 58–60).

Mr. Briggs's attorney opened by explaining that Mr. Briggs was in a car accident in 2002 that required lumbar spinal surgery.  (R. 60).  He stated that since the accident and subsequent surgery, Mr. Briggs's physical condition progressively deteriorated such that by April of 2016, he could not perform any work in the national economy.  (R. 60).  He explained Mr. Brigg's additional issues with both knees, his right ankle and right foot.  (R. 61–62).  At the end of the opening statement, counsel asked to amend Mr. Briggs's alleged onset date to April 1, 2016, which ALJ McCormack granted.  (R. 63).  Next, ALJ McCormack inquired into Mr. Briggs's work history and determined that his past relevant work included his position as a children's institution attendant. (R. 67–68).

The ALJ then asked Mr. Briggs to describe his back symptoms since his alleged onset date. (R. 71–72).  Mr. Briggs explained that his back was in pain "all the time . . . when [he] sleep[s], when [he] walk[s], when [he] sit[s] down[.]"  (R. 72).  When asked what he was unable to do

because of the pain, he responded that he could not sit down, walk, bend over, or pick up things. (R. 72).  He continued that he could not walk very long without back pain that radiated to his legs, that he could only sit down for about 20 minutes, and that even laying down was hard, and he had to put a pillow between his legs.  (R. 72).  He testified that the pain kept him from sleeping through the night.  (R. 72).  Mr. Briggs also explained that his neck, which was also injured in the 2002 car accident, hurt at night and on rotation.  (R. 73).  Mr. Briggs testified that his left knee is still painful, despite his surgeries, and that when walking he has to stop to massage his knee due to the pain, and that at night shooting knee pain wakes him up.  (R. 73).  As to his right knee, he testified that he believes he developed pain based on an old injury from when he was 16, and subsequent use of crutches from his various surgeries.  (R. 74–75).  Mr. Briggs explained that he believes the pain in his right foot is also a result of compensating from the injuries to his back and left knee; he was also diagnosed with an osteochondral defect of the foot.  (R. 74).

ALJ McCormack next briefly inquired into the effect Mr. Briggs's described symptoms had on his daily life and everyday activities.  When asked to describe his typical day, Mr. Briggs testified that he usually starts his day with physical therapy stretches, because his pain is worse in the morning; afterwards, he showers and gets ready by himself.  (R. 79).  Then, Mr. Briggs said that he likes to read or go fishing, which he cannot do "for too long" and then goes home to watch television or read.  (R. 79).  During these activities, Mr. Briggs must change positions, place a pillow between his knees, or do physical therapy stretches.  (R. 79).  Sometimes, his sister will take him for a drive or dinner to get out of the house, but they have "to keep stopping" for him along the way.  (R. 79–80).  ALJ McCormack asked whether Mr. Briggs had a driver's license, to which he replied that he used to, but currently does not drive himself or use public

transportation, but rather uses the medical transportation as necessary.  (R. 80).  The ALJ asked whether Mr. Briggs helped with chores around the house and Mr. Briggs explained that tries to do "little things" around the house, but that he did not help often because he cannot lift much weight.  (R. 81).

ALJ McCormack then took testimony from a vocational expert.  (R. 82).  ALJ McCormack asked the expert whether there were any jobs in the national economy for a hypothetical individual that could perform sedentary work, could not climb ladders, ropes, scaffolds, kneel, squat or crawl, but could occasionally climb ramps and stairs, push and pull, balance, stoop and crouch.  (R. 82).  The expert testified that there were jobs available for such an individual, such as a food and beverage order clerk, charge account clerk, and document preparer.  (R. 82–83).  For a second hypothetical, the ALJ added a limitation of a job allowing at least three absences a month, to which the expert replied there were no such jobs available.  (R. 83–84).

### 2.    The ALJ Decision

On October 29, 2018, ALJ McCormack issued his Decision denying Mr. Briggs SSI and DIB benefits.  (R. 1).  He held that, "[a]fter careful consideration of all of the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act from April 1, 2016, through the date of this decision."  (R. 5).

ALJ McCormack followed the five-step disability determination process.  As a preliminary matter, the ALJ found that Mr. Briggs met the insured status requirements for his DIB application through September 30, 2018.  (R. 6).  At step one, ALJ McCormack found that Mr. Briggs had not engaged in substantial gainful activity since his alleged onset date.  (R. 6).  At step two, the ALJ found that Mr. Briggs had five severe impairments:  lumbar disc bulging; medial meniscus tear of

the left knee, status-post arthroscopies in November 2017 and April 2017; chondromalacia of the right knee; osteochondral defect of the right ankle; and obesity.  (R. 6).

At step three, the ALJ found that Mr. Briggs did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act.  (R. 8).  (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings").  The ALJ found that Mr. Briggs's knee and ankle impairments did not meet or medically equal Listing 1.02, dysfunction of major joints, Listing 1.04, for disorders of the spine.  (R. 8).

ALJ McCormack assessed Mr. Briggs's residual functional capacity (his "RFC") as being able to perform sedentary work with some limitations.  (R. 8).  ALJ McCormack concluded that Mr. Briggs's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entire consistent with the medical evidence and other evidence in the record" because his "allegations of the nature, intensity, persistence [sic] limiting effect of those symptoms are not consistent with the medical signs, laboratory findings and/or other evidence of record which limit the capacity for work related activities."  (R. 12).

ALJ McCormack stated that his RFC finding was supported by the totality of the evidence and by certain portions of the SSA consulting examiner's opinions.  (R. 12).  At step four, ALJ McCormack found Mr. Briggs unable to perform his past relevant work, but at step five found that there were jobs in the national economy that plaintiff could perform, such as a food and beverage order clerk, a charge account clerk, and a document preparer.  (R. 13–14).

### 3.    The Appeals Council decision

On September 4, 2019, the SSA Appeals Council denied Mr. Briggs's request for review of ALJ McCormack's decision.  (R. 20–27).

## III.   DISCUSSION

### A.  Applicable Legal Standards

#### 1.  Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  Id.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts. See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. §§ 404.1512(b), 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. §§ 404.1520b, 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the Court will remand the case for further development of the evidence or for more specific findings.  Rosa, 168 F.3d at 82–83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

## 2.   Standards for benefit eligibility

For purposes of SSI and DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to

by claimant and other witnesses; and (4) the claimant's background, age, and experience."

Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v) and 20 C.F.R. § 416.920(a)(4)(i)–(v). The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### 3.    Treating Physician Rule[7]

The regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."   Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010).   "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Englehart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927([c])(2)); see 20 C.F.R. § 404.1527.

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c); 416.927(c).

---

[7] The Court notes that "[i]n March 2017, the Social Security Administration published regulations that effectively abolished the Treating Physician Rule for claims filed on or after March 27, 2017."  Dorta v. Saul, No. 19 Civ. 2215 (JGK) (RWL), 2020 WL 6269833, at *3 n.8 (S.D.N.Y. Oct. 26, 2020).  Under the new regulations the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).

The ALJ must give "good reasons" for not crediting the plaintiff's treating physician.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (explaining that Appeals Council had "an obligation to explain" the weight it gave to the opinions of the non-treating physicians).  After considering these factors, the ALJ must fully set forth his reasons for the weight assigned to the treating physician's opinion.  Burgess, 537 F.3d at 129.

While the ultimate issue of disability is reserved to the Commissioner, the regulations make clear that opinions from one-time examining sources that conflict with treating source opinions are generally given less weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  See also Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); Cabreja v. Colvin, No. 14 Civ. 4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) (explaining that opinions of one-time consultants should not overrule those provided by the treating medical sources unless there are "serious errors" in treating sources' opinions).  Failing to apply proper weight to a treating physician's opinion is reversible error.  Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015).

**4.    <u>Assessing claimant's subjective allegations</u>**

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) —i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. §§ 404.1529(c), 416.929(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  20

C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010).  "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."  Id.  "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)]."  Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).  If the ALJ does not follow these steps, remand is appropriate.  Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than

treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.

**B.   Evaluation of the ALJ's Decision**

The ALJ evaluated Mr. Briggs's claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled within the meaning of the Act as of his alleged onset date. (R. 6). The Court finds that the ALJ failed to properly weigh the medical evidence concerning whether Mr. Briggs had the capacity to engage in sedentary work, and failed to fully develop the record, such that a remand for further proceedings is warranted.

In addition, remand for a further evidentiary hearing is appropriate because the ALJ failed to apply the proper legal standards in weighing Mr. Briggs's subjective allegations, in that he failed to consider all relevant evidence (or, at least failed to explain his implicit rejection of relevant evidence).

**1.   Weight of the medical opinion evidence**

**a.   Dr. Lauren Redler**

Mr. Briggs argues that the ALJ improperly afforded Dr. Redler's opinion "little weight." (ECF No. 13 at 15–16). He states that although Dr. Redler only saw him twice before documenting her opinion, she incorporated the knowledge of the other doctors at White Plains Hospital who treated Mr. Briggs, and she had substantial knowledge of his case because she reviewed the results of Mr. Briggs's MRIs and his medical chart. (Id. at 16).

The Commissioner responds that the ALJ gave good reasons for giving little weight to Dr. Redler's opinion, which was not entitled to controlling weight because it was inconsistent with

other substantial record evidence.  (ECF No. 18 at 24).  Specifically, the Commissioner argues that

Dr. Redler's "more restricted assessment" is inconsistent with Mr. Briggs's "reported daily

activities, such as caring for himself independently, performing some basic chores, and going out

to dinner."  (Id.)  The Commissioner also argues that Dr. Redler's opinion is entitled to less weight

because it was based on purported limitations after Mr. Briggs's left knee surgery, which had not

yet occurred at the time of the opinion.  (ECF No. 18 at 25).

      First, the Court finds that Dr. Redler's assessment was not inconsistent with Mr. Briggs's

reported daily activities.  To the contrary, Mr. Briggs testified to a very limited range of activities

that are entirely consistent with Dr. Redler's noted limitations.  (R. 81).  For example, Mr. Biggs

testified that he could not generally assist with household tasks because he cannot lift much

weight (R. 81), and indeed, Dr. Redler found that Mr. Briggs could frequently lift and carry up to

ten pounds, occasionally 10–20 pounds, but never more than 20 pounds.  (R. 412).  In addition,

Mr. Briggs testified that during the day and in his daily activities he must change positions, place

a pillow between his knees, or do physical therapy stretches.  (R. 79).  He did say that his sister

would take him for a drive or dinner to get out of the house, but that they had "to keep stopping"

for him along the way.  (R. 79–80).  Similarly, Dr. Redler opined that in an eight-hour workday,

Mr. Briggs could sit with his knee extended and leg elevated for three to four hours and could

stand or walk for less than an hour.  (R. 412).  She further stated that it was medically necessary

for Mr. Briggs to avoid sitting for an eight-hour day, that he needed fifteen minutes before he

could return to a seated position; and that he must elevate his leg to waist level while sitting for

prolonged periods of time.  (R. 413).  Mr. Briggs did not testify to engaging in any daily activities

outside of these parameters, thus Dr. Redler's assessment was consistent with Mr. Briggs's reported activities and should not have been a basis for affording her opinion little weight.

In addition, Dr. Redler's assessed functional limitations were not inconsistent with Dr. Spooner's opinion, when properly considered as a whole.[8]  However, Dr. Redler's opinions were based on a future event, the upcoming left-knee reconstructive surgery, and thus were based on her speculation of Mr. Briggs's post-surgery limitations (albeit with the benefit of his medical history and imaging), which supports assigning the opinion less weight.  But, because the record demonstrates that Mr. Briggs saw Dr. Redler for several post-surgery appointments, instead of relying on the brief progress notes only pertaining to his knee surgery,[9] ALJ McCormack should have requested an updated opinion from Dr. Redler.  This record development was especially important because Dr. Redler's opinion is the only medical opinion evidence in the record that was based on a full review of Mr. Briggs's medical history and diagnostic imaging.  In light of the ALJ's affirmative duty to develop the administrative record, "'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" Burgess, 537 F.3d at 129 (citing Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)).  This was a clear gap in the record that ALJ McCormack should have developed before rejecting Dr. Redler's opinion as a treating source.

---

[8] As discussed further below, it was improper for ALJ McCormack to sever Dr. Spooner's opinion and weigh its parts separately.  (See infa § III.B.1.c).

[9] While noting that the statement was not a "specific functional assessment," ALJ McCormack nevertheless afforded "greater weight" to Dr. Redler's progress note statement that Mr. Briggs was clear to engage in gym exercises than her opinions as to Mr. Briggs's functional limitations (which he provided "little weight"), even though they were supposed to be addressing the same time period.  (R. 11–12).  The ALJ did not address this inconsistency.

**b. Dr. Julia Kaci**

Mr. Briggs argues that Dr. Kaci's opinion should not have been afforded significant weight because she did not have Mr. Briggs's medical history or imaging records, and that her opinion is too vague, in that she did not address Mr. Briggs's specific functional limitations.  (ECF No. 13 at 20).  Mr. Briggs also avers that even if this weight is appropriate, Dr. Kaci's finding that Mr. Briggs was moderately limited in his ability to sit conflicts with the ALJ's RFC.  (Id. at 21).

The Commissioner argues that Dr. Kaci's opinion was appropriately afforded significant weight because it was consistent with the record overall in that it found "only some gait abnormality," and noted Mr. Briggs's reported daily activities such as "caring for himself, going out to dinner, and periodically cooking, shopping and doing laundry."  (ECF No. 18 at 27).  In response to Mr. Briggs's contention that the consultative examiners should have been provided his medical records and imagining results, the Commissioner argues that there is no "blanket rule" that such evidence be reviewed by a consultative examiner.  (Id. at 28).

Again, the Court must look at Mr. Briggs's reported daily activities in context.  Mr. Briggs did not represent to Dr. Kaci that he "took care of himself" and could fully participate in activities such as cooking, shopping and laundry.  (R. 369).  Rather, Mr. Briggs stated that he "cook[ed] once a week, [did] not do any cleaning because he cannot bend down . . . [and did] [l]aundry and shopping once a week," (R. 369), which are activities that do not contradict his alleged limitations.  The ALJ also failed to note that Dr. Kaci assessed Mr. Briggs in June 2016, and thus her opinion pre-dates most of the medical record evidence.

The Commissioner should have provided Dr. Kaci Mr. Briggs's medical record and imaging before her consultative examination.  While the Commissioner is correct that there is not a

"blanket rule" that medical histories be provided to consultative examiners, 20 C.F.R. § 404.1417 and § 416.917 state "[w]e will [] give the examiner any necessary background information about your condition."  Here, the objective imaging and treatment records were critical information regarding Mr. Briggs's conditions.  See Burgess, 537 F.3d at 132 (opinions from a consultative examiner were not substantial evidence when he did "not appear to have read the MRI Report" and other medical evidence); Jackson v. Colvin, No. 13 Civ. 5655, 2014 WL 4695080, at *20 (S.D.N.Y. Sept. 3, 2014) (finding that ALJ erred by affording "great weight" to an opinion from a consultative examiner who did not review claimant's treatment records).

On remand, the ALJ should consider in particular the appropriate weight to give SSA consultative examiners' opinions when such opinions are not based on Mr. Briggs's full medical history.  In the alternative, the ALJ can request an additional evaluation and provide the examiner with the relevant medical background.

### c.    Dr. Nina Spooner

ALJ McCormack found that the "narrative portion" of Dr. Spooner's examination report conflicted with the Check Box Questionnaire, and subsequently assigned those portions separate weight.  (R. 11).  The ALJ afforded "significant weight" to Dr. Spooner's narrative medical source statements, but "little weight" to her attachedCheck Box Questionnaire that delineated her assessed functional limitations.  (R. 11).

Mr. Briggs argues that if the ALJ perceived any inconsistencies in Dr. Spooner's opinion, the ALJ should have contacted her for a clarification before rejecting the opinion, as the regulations in fact require.  (ECF No. 13 at 22) (citing 20 C.F.R. § 404.1519p and § 416.919p (the ALJ must resolve inadequate or incomplete findings from a consultative examiner); and 20 C.F.R.

§ 404.1527(c)(3) and § 416.927(c)(3) (directing that if evidence from examining sources is not sufficient the medical source will be re-contacted)).  The Commissioner argues that Mr. Briggs has "failed to show any error in the ALJ's assessment of significant weight to Dr. Spooner's narrative post-examination opinion and little weight to Dr. Spooner's check-box assessment." (ECF No. 18 at 30).  In addition, the Commissioner argues that the ALJ had no duty to recontact Dr. Spooner for clarification because he had sufficient evidence on which to evaluate the opinion as inconsistent with the record.  (Id. at 31).

The Court finds the Commissioner's arguments unavailing.  There is no evidence or case support to justify ALJ McCormack's decision to sever portions of Dr. Spooner's opinion and then assign higher weight to the portion supporting the RFC, while discounting the portion of the opinion that assessed greater functional limitations.  Notably, Dr. Spooner is an SSA Consultative examiner, and is familiar with the administration's regulations and guidelines.  (See R. 507).  In his decision, the ALJ specifically noted that because Dr. Spooner was "an examining source with expertise in orthopedic surgery, [her] opinion is given significant weight."  (R. 11).  The ALJ continued, however, that "little weight is accorded to the opinions noted by Dr. Spooner in the attached Medicaid Source Statement of Ability to do Work-related Activities (Physical), as they are grossly inconsistent with Dr. Spooner's medical source statement opinions."  (R. 11).  The ALJ perceived an inconsistency between the narrative portion of Dr. Spooner's report, which found that Mr. Briggs had "moderate" limitations in the ability to lift, carry, sit, stand, walk, bend and climb stairs, and the Check Box Questionnaire that Mr. Briggs could not lift or carry ten pounds, and could only sit for 20 minutes at a time.  (R. 11).

The Court does not find these portions of Dr. Spooner's opinion "grossly" inconsistent for several reasons.  First, the ALJ stated that Dr. Spooner "only" found moderate limitations, but as discussed further below (infra § III.B.4), Courts in this district routinely find that a "moderate" limitation in the ability to sit or stand is consistent with the inability to perform sedentary work, and thus is not inconsistent with the limitations Dr. Spooner noted as to Mr. Briggs's ability to lift, carry, stand, walk, bend and climb stairs.

Second, the ALJ should have considered Dr. Spooner's opinion as a whole, in that her narrative was one element of her opinion, meant to be considered in conjunction with her more detailed opinions as to functional limitations contained in the Check Box Questionnaire.  This is especially the case when almost every notation on the Check Box Questionnaire is supported with additional narration from Dr. Spooner with the reasons for the assessed limitation.[10]  Dr. Spooner was aware that vague descriptions as to functional limitation alone are insufficient to constitute substantial evidence, see Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) (finding a medical opinion of "impairment is: [l]ifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" "so vague as to render it useless in evaluating whether [the claimant could] perform sedentary work"), and thus used the Check Box Questionnaire to specify and elucidate the more general opinions contained in the narrative portion of her report.

---

[10] For example, to support her opinion that Mr. Briggs could occasionally reach and handle, but never push or pull, Dr. Spooner wrote next to the check box "claimant has chronic pain in his back, both his knees and in his right foot and ankle. He can't do sustained sitting or standing or tasks requiring sustained sitting or standing. Claimant also has history of lumbar spine surgery and should not be doing pushing or pulling, would cause back pain and overuse of his back."  (R. 514).  Next to her opinion that Mr. Briggs could never climb stairs or ramps, ladders or scaffolds, balance, stoop, kneel crouch or crawl, Dr. Spooner noted "claimant can't balance himself safely all the time due to chronic back, bilateral knee and right ankle and food pain, and also due to the limitation of range of motion of his back and knees. He can't support himself on his knees."  (R. 515).  The limited range of motion and evidence of chronic pain are supported also supported by Dr. Spooner's physical examination findings (R. 10), and are cross-corroborated throughout the record.

The ALJ found the check box portions "inconsistent" with the narrative portion, but that is not the case when the report is read as a whole.  The Check Box Questionnaire provides more detail and should have been interpreted as underlined specifying her opinions in the narrative portion of the report, not contracting them.  On remand, the ALJ should weigh Dr. Spooner's opinion holistically.  If any perceived inconsistencies persist, the ALJ should request further clarification from or a follow-up examination by Dr. Spooner.

### 2.    Evaluation of Mr. Briggs's subjective allegations

Mr. Briggs also contends that the ALJ did not properly evaluate his subjective allegations regarding his pain.  (ECF No. 13 at 24).  ALJ McCormack found that while Mr. Briggs's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence[.]"  (R. 12).

The Commissioner argues that the ALJ properly evaluated Mr. Briggs's allegations of his symptoms and resulting limitations because the record demonstrated that Mr. Briggs had improved with treatment, surgery on his left knee, and injections for his lower back, and only had mild right knee and right ankle findings.  (ECF No. 18 at 31–32).  The Commissioner also states that the ALJ properly cited Mr. Briggs's daily activities as evidence of his ability to meet the exertional demands of sedentary work, and that SSA consultative opinions support the capacity for sedentary work.  (Id. at 32).

As noted above, when a claimant reports symptoms that are more severe than medical evidence alone would suggest, the regulations require the ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996

WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.  ALJ McCormack did not analyze these seven factors.

ALJ McCormack used Mr. Briggs's limited testimony regarding his daily activities as evidence that he is not disabled and can perform sedentary work, but failed to develop the record on the limiting effects of the severe impairments on his daily activities.  At the hearing, the ALJ only asked Mr. Briggs to describe a typical day, he did not ask for any specifics regarding general activities, did not inquire into the duration of his activities, how his physical impairments limited those activities, if medication relieved any of his symptoms, or what other measures, if any, Mr. Briggs used to relieve his pain during such activities.  (R. 78–81).

For example, Mr. Briggs testified that he lives with his mother, who does the cooking, and that he cannot help with household chores.  (R. 79, 81)  The ALJ did not inquire if Mr. Briggs ever cooked (other record evidence indicated that he cooked once a week (see R. 379)), what Mr. Briggs liked to cook, how long it took to prepare, what he did to limit pain while cooking, nor any other inquiry that could then support the ALJ's reliance on this fact to support sedentary work. Similarly, the ALJ did not inquire into what he did help with around the house, or ask why he was

unable to help with chores, especially those that did not require lifting.  The ALJ also relied on the fact that Mr. Briggs stated that he liked to go out to dinner to support the sedentary RFC (R. 12), but there is no information in the record as to how often he went out to dinner, how long he could sit or stand once at dinner, and the ALJ did not address the conflicting testimony that when he did go out in a car, he had to stop multiple times along the way due to his pain.  These stated activities do not demonstrate that Mr. Briggs is not disabled, and it was legal error to fail to evaluate and discuss the rigor of Mr. Briggs's daily activities.  See Archambault v. Astrue, 09 Civ. 6363, 2010 WL 5829378 *30 (S.D.N.Y. Dec. 13, 2010) ("The ALJ also remarked . . . plaintiff's reported activities of daily living, which included self-care, childcare duties, a few household chores, and some pastimes, indicate that 'he is not debilitated.'. . . As the ALJ failed to discuss the rigor of plaintiff's daily activities and presumed that those activities demonstrated a lack of disability, she committed legal error" (citations omitted)), adopted by, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).  Thus, on remand, the ALJ must engage the required analysis for determining the credibility of a claimant's symptoms and their limiting effects as required by 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

### 3.    Development of the record

As noted above, the ALJ failed to develop the record as to Dr. Redler's treating source opinion (supra § III.B.1.a), improperly severed portions of Dr. Spooner's opinion as inconsistent without first contacting her for clarification (supra § III.B.1.c), and failed to develop the record as

to the rigor of Mr. Briggs's daily activities (supra § III.B.2).  On remand, the record must be developed as to those points.

In addition, although it is clear from the record that Dr. Weinstein was Mr. Briggs's treating orthopedist, his opinion as to Mr. Briggs's RFC is not in the record and was seemingly not requested by Mr. Briggs or the ALJ.  Given that ALJ McCormack "rejected the [other] treating physician's opinion," he had an "affirmative duty to develop the record fully by obtaining an opinion from Jackson's current treating physician."  Jackson v. Colvin, No. 13 Civ. 5655 (AJN) (SN), 2014 WL 4695080, at *19 (S.D.N.Y. Sept. 3, 2014); Beller v. Astrue, 12 Civ. 5112 (VB) (PED), 2013 WL 2452168, at *18 (S.D.N.Y. June 5, 2013) (concluding that the relationship between the treating physician rule and the duty to develop the record required the ALJ to request an RFC assessment from a treating physician); Peed v. Sullivan, 778 F. Supp. 1241, 1247 (E.D.N.Y. 1991) (remanding for failure to obtain an opinion from claimant's treating physician).

On remand, the ALJ should request a medical source statement from Dr. Weinstein regarding any functional limitations resulting from Mr. Briggs's impairments.

### 4.   Determination of Mr. Briggs's residual functional capacity

ALJ McCormack found that Mr. Briggs was capable of performing sedentary work.  (R. 8). Mr. Briggs argues that the RFC finding is not supported by the evidence on which the ALJ purported to rely.  (ECF No. 13 at 18).  Specifically, Mr. Briggs notes that the ALJ gave "significant weight" to the opinion of SSA consultative examiner Dr. Kaci, but that her findings that Mr. Biggs had "moderate limitations" as to sitting are not consistent with the capacity to perform sedentary work.  (Id.)  The Commissioner responds that ALJ McCormack's RFC finding was supported by substantial evidence and was properly determined after considering Mr. Briggs's subjective

statements, the medical opinions of record the treatment history of record and Mr. Briggs's purported activities. (ECF No. 18 at 21–22). The Commissioner points to the ALJ's finding that Mr. Briggs's left knee had improved with surgery, that the medical evidence showed only "mild" findings as to his lower back, that due to his right ankle, he was only restricted from "high impact activities" and that he only demonstrated mildly limited range of motion in the right knee. (Id. 22–23). The Commissioner argues further that Dr. Kaci's assessment of "moderate" limitations in siting are not inconsistent with sedentary work. (Id. at 28).

Because the Court has already determined, for the reasons discussed above, that remand for further evidentiary proceedings is necessary, the Court need not reach this issue. Morales v. Colvin, No. 13 Civ. 6844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (court need not reach additional arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), adopted, 2015 WL 2137776 (S.D.N.Y. May 4, 2015). On remand, the RFC analysis may change based on further development of the record, the proper assignment of weight to opinion evidence, and on proper evaluation of Mr. Briggs's subjective complaints.

The Court notes, however, that Courts in this district have found "moderate" limitations in ability to sit and stand do preclude even sedentary work. Cooper v. Saul, 444 F. Supp. 3d 565, 579 (S.D.N.Y. 2020) ("Here, it is not 'obvious' that a mild limitation on sitting 'translates into a set number of hours' [citing Perozzi v. Berryhill, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018)] . . . [t]here is simply insufficient information in [the consultative examiner's] opinion to allow a finding that Cooper can sit for a six-hour period."); Garretto v. Colvin, 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no

support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day."); <u>Richardson v. Astrue</u>, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (consulting doctor's vague conclusion that "[plaintiff's] ability to sit was 'mildly to moderately' impaired . . . provides no support for ALJ's [ ] conclusion that [plaintiff] could perform sedentary work").

The Court also notes that in support of the RFC, the ALJ cited findings as to each impaired joint but did not discuss the limiting effects of the impairments in combination, nor did the ALJ address the difference in time between the various medical opinions.  On remand, the ALJ should carefully consider to the cumulative effects, if any, of Mr. Briggs's severe impairments, and the change of physical limitations due to the passage of time.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Mr. Briggs's motion for judgment on the pleadings (ECF No. 12) is GRANTED and the Commissioner's motion (ECF No. 17) is DENIED.  The Commissioner's decision denying benefits is vacated, and this matter is remanded to the agency for further proceedings.

The Clerk of Court is respectfully directed to close this case.

Dated:        New York, New York
              February 26, 2021

                                        SO ORDERED


                                        SARAH L. CAVE
                                        United States Magistrate Judge